UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

GEORGE C. POLIS, JR.,

                Plaintiff,

      -against-

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.

--------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 1 3 2010 ★

BROOKLYN OFFICE

ORIGINAL

**MEMORANDUM AND ORDER**
Case No. 09-CV-379 (FB)

*Appearances*:
*For the Plaintiff*:
CHARLES E. BINDER, ESQ.
Law Offices of Harry J. Binder &
Charles E. Binder, P.C.
60 East 42nd Street, Suite 520
New York, New York 10165

*For the Defendant*:
LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
By:    KEVIN P. MULRY, ESQ.
         Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

*On the Brief*:
STEPHEN P. CONTE, ESQ.
SATHYA OUM, ESQ.

**BLOCK, Senior District Judge:**

        Plaintiff George C. Polis, Jr. ("Polis") seeks review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB"); both parties move for judgment on the pleadings. Fed. R. Civ. P. 12(c). Because the administrative law judge ("the ALJ") inappropriately disregarded the opinions of Polis's treating physicians, Polis's motion is granted; the case is remanded solely for the calculation of benefits.

The following facts are drawn from the administrative record ("AR") of the proceedings before the Commissioner. Polis was born in 1964 and worked as a retail salesperson for most of his adult life. He applied for DIB on September 20, 2004, claiming disability due mostly to mental impairments.[1]

## A.  Record Evidence of Polis's Mental Impairments

The following evidence was put before the ALJ. Polis was admitted on August 18, 2004, to the emergency room of Elmhurst Hospital ("Elmhurst"), complaining of depression and insomnia. He reported that he had been asked to resign from his employment because he was calling in sick several times per week; he denied psychosis or any intent to harm himself or others. He was diagnosed with adjustment disorder with a depressed mood and prescribed Trazodone, an antidepressant medication; major depressive disorder was noted as a possible diagnosis. An appointment for an outpatient psychiatric evaluation was scheduled for August 26, and Polis was discharged.

### 1.  *Opinions of Treating Psychiatrists and Psychologists*

#### a.  *Dr. Daniel Garza (Psychiatrist)*

On August 26, 2004, Polis was seen by Dr. Daniel Garza ("Dr. Garza"), an Elmhurst psychiatrist. Dr. Garza treated Polis monthly until September 2006; his evaluations of Polis were based on his objective observations and Polis's subjective complaints. Dr. Garza completed a psychiatric/psychological questionnaire at the request

---

[1] Polis's application was initially denied, but that determination was reversed by the Appeals Council. *See* AR at 78-79 (Appeals Council order remanding for second hearing). It is the result of that second hearing, held February 21, 2008, that is before the Court.

of Polis's counsel. *See* AR at 212-19 (report dated Mar. 14, 2006). Dr. Garza diagnosed major depression (recurrent), and reported a Global Assessment Functioning ("GAF") score of 60-70.[2] Dr. Garza noted the following positive clinical findings: sleep disturbance, mood disturbance, emotional lability, social withdrawal/isolation, anhedonia, and psychomotor agitation/retardation.[3] Polis had not been hospitalized for these symptoms.

Dr. Garza also reported a number of functional limitations, rating Polis as "markedly limited" in his ability to "complete a normal workweek without interruptions" from his psychological conditions, and "maintain socially appropriate behavior" and "adhere to basic standards of neatness and cleanliness"; he also noted a number of moderate and mild limitations. AR at 215-17. Dr. Garza prescribed the antidepressants Paxil, Trazodone, and Wellbutrin, and opined that Polis's symptoms were persistent. Although Dr. Garza believed Polis could work in a "low stress" environment, he also believed that Polis would be absent from work more than three times per month on account of his psychological condition.[4]

---

[2] A GAF score is a "clinician's judgment of [an] individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A score of 61-70 indicates "mild symptoms"; 51-60 indicates "moderate symptoms"; and 41-50 indicates "serious symptoms[.]" *Id.* at 32.

[3] "Lability" is "the state of being . . . [u]nstable; unsteady; not fixed[.]" *Stedman's Med. Dictionary* 220590, 220600 (27th ed. 2000). "Anhedonia" is an "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." *Id.* at 23060.

[4] The psychiatric and psychological evaluations in the record ask the clinician to estimate how often the patient will be absent from work as a result of their impairments; the choices are: less than once per month; about once per month; about two to three times per month; and more than three times per month. *See, e.g.,* AR at 219 (Dr. Garza's report).

Dr. Garza continued to see Polis after completing this report; the progress notes reflect that in April of 2006, Polis reported "starting to hear his name being called." *See* AR at 335 (progress note dated Apr. 11, 2006). In their next appointment, Dr. Garza observed that Polis's mood had worsened and that Polis reported "passive" suicidal intent but said he "would never do it" because it would "[a]ffect the people he loves[.]" AR at 337-38 (progress note dated May 9, 2006). Dr. Garza noted that Polis was "malodorous, [his] clothes smell[ed]" although he was "neatly but simply groomed"; he prescribed Seroquel (an antipsychotic medication), and discontinued Trazodone. AR at 337-38. At their next appointment Polis was "coherent [and] goal-oriented" with "less odor"; Dr. Garza opined that he was "still depressed" or "dysthymic[,]" but concluded that he was in "partial remission[.]"[5] AR at 339-40 (progress noted dated June 13, 2006). Two weeks later, Dr. Garza observed a "[m]alodor[ous], but clean shaven" patient with "mild irritability[,]" and again noted "partial remission[.]" AR at 370 (progress note dated June 27, 2006). Polis reported that his sleep had improved to four hours per night without interruption and that he had been able to attend a parade. Polis's psychotherapy treatments with Dr. Glenn Toplyn, *see* p. 5, *infra*, had been "[t]erminated . . . due to [Toplyn's] departure." AR at 370.

Dr. Garza wrote a letter to Polis's counsel on July 17, 2006, reporting that Polis's symptoms "prevent a reasonable incorporation into a competitive work schedule

---

[5] Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by . . . poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." *Stedman's Med. Dictionary* 122470 (27th ed. 2000).

of any regularity. His prognosis is guarded given the chronicity of his symptoms and is expected to last well over 12 months." AR at 316.

The last progress note from Dr. Garza, from September 2006, states that Polis was still "malodorous, damp [and] dirty"; he was "coherent [and] goal-oriented" with stable sleep but "mood fluctuation[.]" AR at 343-44 (progress noted dated Sept. 5, 2006). Dr. Garza observed that Polis appeared to be "[i]n remission on med[ication.]" AR at 343.

b.    *Dr. Glenn Toplyn (Psychologist)*

The record contains several progress notes from a Dr. Glenn Toplyn, Ph.D ("Dr. Toplyn"), a physician at Elmhurst.[6] The notes are nearly illegible and are not referred to in either the ALJ's decision or Polis's memorandum. Based on Dr. Garza's notes, however, it appears that Dr. Toplyn was a clinical psychologist who served as Polis's psychotherapist during at least a portion of 2006. *See, e.g.,* AR at 368 (Dr. Garza's progress note of June 13, 2006, one week before Polis's last visit with Dr. Toplyn: "Terminating w[ith] therapist next w[ee]k."); AR at 370 (Dr. Garza's progress note of June 27, 2006, one week after Polis's last visit with Dr. Toplyn: "Terminated from psychotherapy due to provider's departure.").

Albeit difficult to read, Dr. Toplyn's records reflect that he was treating Polis for depression and anxiety. *See* AR at 382-83 (describing Polis's problems as "[d]epression,

---

[6] *See* AR at 358-63 (notes dated Feb. 22, 2006; Mar. 7, 2006; Mar. 15, 2006; Mar. 21, 2006; Mar. 28, 2006; Apr. 11, 2006; Apr. 18, 2006; May 4, 2006; May 24, 2006; May 30, 2006; June 13, 2006; and June 20, 2006); *see also* AR at 374-75 (treatment plan review completed by Dr. Toplyn, dated Feb. 24, 2006); AR at 376-78 (statement of patient participation completed by Dr. Toplyn, dated same); AR at 379-80 (treatment plan review completed by Dr. Toplyn, dated May 24, 2006); AR at 381-83 (statement of plan participation completed by Dr. Toplyn, dated same).

as manifested by sad mood, withdrawn behavior, hopelessness . . ." and "[d]ifficulty coping with stress as manifested by anxiety an [illegible] related to stressful circumstances").

     *c.    Dr. Kauser Shamim (Psychiatrist)*

     Polis was later treated by Dr. Kauser Shamim ("Dr. Shamim"), a psychiatrist at the Woodside Mental Health Clinic ("Woodside").[7] Dr. Shamim saw Polis once per month from November 16, 2007 until January 14, 2008; he later completed a report at the request of Polis's counsel. *See* AR at 422-29 (report dated Apr. 12, 2008). Like Dr. Garza's records, Dr. Shamim's records reflect his objective observations of Polis and Polis's subjective complaints.

     Dr. Shamim diagnosed Polis with panic disorder and agoraphobia, dysthymia disorder, and depressive disorder; he assessed a GAF score of 50. AR at 422; *see also* AR at 440-42 (mental status examination dated Nov. 5, 2007, completed by Dr. Shamim, reporting same). Dr. Shamim noted the following positive clinical findings: sleep disturbance, mood disturbance, social withdrawal/isolation, decreased energy, recurrent panic attacks, anhedonia, generalized persistent anxiety, feelings of guilt/worthlessness, and difficulty thinking or concentrating. Dr. Shamim rated Polis as "markedly" limited in his ability to "work in coordination with or proximity to others" without becoming distracted, "interact appropriately with the general public[,]" and "travel to unfamiliar places or use public transportation." AR at 425-27. He also rated Polis as "moderately limited" in several areas,

---

[7] This physician's name appears in the record both as "Shamim" and "Shamin"; the Court adopts the spelling "Shamim" since that spelling appears more frequently.

including "make simple work related decisions[,]" and "complete a normal workweek without interruptions" from his psychological conditions. AR at 425-27. Dr. Shamim opined that Polis would experience episodes of decompensation in the workplace, based upon Polis's recounting of an episode from "several years" before at a prior job at Home Depot; Polis told Dr. Shamim that he "was unable to perform work tasks due to becoming severely anxious [with] numerous customers[.]" AR at 427. Polis was taking Prozac. Dr. Shamim believed that he was limited to "low stress" jobs due to being "easily agitated," AR at 428, and would miss work more than three times per month.

### 3. *Examinations of Polis By Non-Treating Physicians*

#### *a. Dr. Elsa Morse (Psychologist)*

Dr. Elsa Morse ("Dr. Morse"), a psychologist selected by the Commissioner, examined Polis.[8] *See* AR at 172-75 (report dated Nov. 18, 2004). Dr. Morse observed that Polis had a "depressed and hopeless" affect, a "dysthymic" mood, a "mode of dress [that] was somewhat disheveled[,]" with "personal hygiene and grooming [that] were somewhat poor." AR at 172-73. Dr. Morse diagnosed major depressive disorder and generalized anxiety disorder, concluding:

> [Polis] could probably follow and understand simple directions and instructions. [Polis] could perform simple tasks independently. However, [Polis] cannot maintain attention and concentration. [Polis] is not able to maintain a regular schedule. [Polis] is not able to learn new tasks, or to perform complex tasks even under supervision. [Polis] is not able to make appropriate decisions. [Polis] is not able to relate adequately with others, or able to deal appropriately with

---

[8] Dr. Morse's report does not specify that she was selected by the Commissioner, but the Commissioner's brief represents that she was. Comm'r's Br. at 5.

stress. These difficulties are caused by his psychiatric
problems . . . [and] may significantly interfere with [Polis's]
ability to function on a daily basis.

AR at 174-75.

b.    *Dr. Azariah Eshkenazi (Psychiatrist)*

Dr. Azariah Eshkenazi ("Dr. Eshkenazi"), a psychiatrist selected by Polis,

examined him on February 19, 2008. *See* AR at 454-64 (Dr. Eshkenazi's narrative report and

completed questionnaire). Dr. Eshkenazi noted that he had reviewed Polis's records from

Elmhurst and Woodside, and listed a personal history and psychiatric history relying on

those records and Polis's statements to him, and completed a report similar to those

completed by Drs. Garza and Shamim. Dr. Eshkenazi diagnosed major depressive

episodes and general anxiety, with a GAF of 50 (indicative of "serious" symptoms), and

noted several of the same positive clinical findings listed by Drs. Garza and Shamim,

including but not limited to sleep disturbance, emotional lability, recurrent panic attacks,

social withdrawal or isolation, and anhedonia. Dr. Eshkenazi also checked off a number

of functional limitations: Polis's "marked" limitations included "ability to carry out

detailed instructions" and "ability to perform activities within a schedule [and] maintain

regular attendance[.]" AR at 460-62. Dr. Eshkenazi opined that Polis was not capable of

performing even "low stress" jobs, and that he would be absent from work more than three

times per month on account of his condition. Dr. Eshkenazi's report concluded: "[I]t is my

opinion with a reasonable degree of medical certainty that [Polis] is not able to be gainfully

employed, at present. I should note that he is able to manage his funds." AR at 456.

8

4. *Evaluation of Polis by Non-Examining Physician*

Dr. George Wing ("Dr. Wing") did not examine Polis, but completed two documents dated December 27, 2004. *See* AR at 187-90 (completed form for "mental residual functional capacity assessment"); AR at 191-204 (partially-completed form for "psychiatric review technique"). The record does not reflect who retained Dr. Wing; it seems likely it was the Commissioner because Dr. Wing's reports are on forms created by the Commissioner. Dr. Wing did not specify his medical specialty, although it seems likely it was psychiatry. *See* AR at 189 (referring to "psychiatric" aspect of Polis's condition).

Dr. Wing's review of Polis's medical history was limited to Dr. Morse's report; Dr. Wing's report is brief, noting that Polis was moderately limited in his ability to "perform activities within a schedule [and] maintain regular attendance," and "complete a normal workday and workweek without interruptions" from his psychiatric conditions. AR at 187-88. Dr. Wing concluded:

> [Polis] has impaired or moderate limitations to understand, remember and carry out simple instructions; to concentrate for up to two hours at a time; to relate appropriately to supervisors and coworkers; and to adapt to changes in the work environment. From the psychiatric aspect, this claimant can do simple tasks.

AR at 189.

5. *Observations of Polis by Non-Physicians*

a. *New York Commissioner of Social Services*

In 2007, the New York City Commissioner of Social Services petitioned to have Polis declared incompetent, and to appoint a guardian. *See* AR at 391-95. The petition filed by the Corporation Counsel of New York stated, among other things, that: (1) Polis

9

had been diagnosed with recurrent major depressive disorder and panic disorder, among other maladies; (2) Polis was "fearful of crowds"; (3) Polis was being evicted; (4) Polis's apartment was "very cluttered, dirty, with roaches and in need of a heavy duty cleaning[.]" AR at 403-13. Polis was eventually declared incapacitated; the Self-Help Community Services ("Self-Help") agency was appointed as guardian of his interests. *See* p. 13, *infra.* (testimony of Natasha Molina on behalf of Self-Help). Self-Help was also appointed guardian to Polis's aunt (and roommate), who was also declared incapacitated. *See id.*

        b.     *Vanessa Acevedo (LCSW)*

Vanessa Acevedo ("Acevedo"), a licensed clinical social worker, performed a psychiatric evaluation of Polis on October 4, 2006, at Queens Mental Health Service ("QMHS"). Acevedo diagnosed severe and recurrent major depressive disorder and noted Polis's treatment history with Drs. Garza and Toplyn. Acevedo noted that Polis had a depressed mood, "hear[d] voices on occasion," and had "passive thoughts of suicide with NO plan." AR at 386 (emphasis in original).

Based on what Polis told her, Acevedo noted that "due to funding[,] Dr. Garza could not assign [Polis] to another psychologist" after Dr. Toplyn had "relocated out of state." AR at 385, 387. Polis said that he cried "for hours at a time, 4-5 [times] weekly." AR at 387. Polis reported that his depression had begun in 2004, that he continued to feel depressed, and that he did "not like being in crowds" since 2003. AR at 388.

        c.     *Robert McRae (LCSW)*

Robert McRae ("McRae"), another licensed clinical social worker at QMHS, completed an undated psychiatric evaluation of Polis at some point after October 10, 2006.

*See* AR at 444, 451 (noting first treatment at QMHS of October 10, 2006). McRae diagnosed a recurrent major depressive disorder and a GAF of 50; he opined that Polis's prognosis was "[p]oor regarding [his] return to optimal functioning and working full time job with no restrictions." AR at 444. McRae noted many of the same positive clinical findings identified by Drs. Garza, Shamim and Eshkenazi, including but not limited to: sleep disturbance, emotional lability, social withdrawal, anhedonia, decreased energy, and feelings of guilt/worthlessness. McRae opined that Polis was markedly limited in his "ability to complete a normal workweek without interruptions[,]" AR at 448, and "perform activities within a schedule [and] maintain regular attendance[,]" AR at 447. McRae concluded that Polis was not capable of tolerating even a low stress work environment, and that his condition would cause him to be absent from work more than three times per month.

### 6.   *Summary of Record Evidence*

There was, in sum, a host of opinions in the record before the ALJ that cast significant doubt upon Polis's ability to perform any gainful employment. Every doctor to examine him concluded that his depressive disorder and anxiety disorder were serious impairments that made it difficult, if not impossible, for him to maintain a normal work schedule. Two licensed clinical social workers registered observations in line with those opinions. The City of New York effectively concurred since it had sought to have Polis declared legally incompetent. The only opinion in the record not in perfect alignment with this dominant theme was that of Dr. Wing, and Dr. Wing notably took no position on whether Polis could adhere to a normal work schedule.

11

## C. Testimony Before the ALJ

### 1. *Polis*

After the ALJ briefly reviewed Polis's testimony from the prior hearing, Polis testified about the treatment he was receiving from Dr. Shamim, and his weekly visits with a therapist. Polis lived with his aunt, for whom he cooked dinner ("very simple meals . . . microwavable food") and would occasionally connect her to her oxygen machine. AR at 501, 505. Neither of them cleaned their apartment; Adult Protective Services came once in 2006 and removed fifty large garbage bags of debris. Polis denied any social contacts or activities, although he did say he would sometimes pick up food from a nearby fast food restaurant. His daily activities consisted of "sit[t]ing at home and look[ing] at the television." AR at 496. Polis had a domestic relationship, but his partner was incarcerated; Polis had visited him occasionally at a facility in Buffalo, traveling by bus, and visited him once on Riker's Island, also by bus. Polis still suffered the auditory hallucinations first reported in 2006; he heard a voice calling his name "once every few weeks." AR at 504. When the ALJ asked why he could not return to work, Polis responded "I still have the same problems. Basically my aversion to crowds. I really can't stand or sit very long, and if there is a major crowd, I will probably end up passing out because like I say, I do break out into a cold sweat and I do get dizzy[.]" AR at 498.

In response to questioning from his attorney, Polis conceded that he had attended a parade in 2006, but this was a one-time event that has not been repeated. Two to three times per week, he would curl up on his bed and cry for a few hours; he slept two to four hours per night.

12

## 2. *Natasha Molina*

Natasha Molina ("Molina"), a benefits coordinator with Self-Help Community Services ("Self-Help"), testified that Self-Help was appointed as Polis's guardian after the New York Supreme Court found Polis to be incapacitated. She explained: "Basically he can't maintain his own bills . . . We pay his bills for him but with his own income." AR at 508. Molina added that, on Polis's behalf, Self-Help would be applying "for all government based benefits like Section 8, Social Security, public assistance." AR at 509. Polis's aunt was also declared incapacitated; Molina testified that Self-Help had been appointed as her guardian as well.

## 3. *Dr. Edward Halperin (Medical Expert)*

Dr. Edward Halperin ("Dr. Halperin"), a board-certified psychiatrist, testified as a medical expert at the Commissioner's request. *See* 20 C.F.R. § 404.1527(f)(2)(iii) (authorizing ALJ's to ask for opinions of medical experts). Dr. Halperin engaged in a rather rambling review of the medical evidence, focusing frequently on irrelevant matters. *See, e.g.*, AR at 516 (noting that Polis's "twin brother" was mentioned in Dr. Eshkenazi's report but nowhere else in the chart); AR at 522 (asking Polis why his rent payments had become in arrears; "I'm sort of curious how it got that high."). He minimized the extent of Polis's depression since he had never been hospitalized; minimized the extent of Polis's auditory hallucinations because it was "more a symptom of . . . diffuse anxiety [and] there really seems to be very little affect or anxiety connected with it[,]" AR at 517; and, based on personal (not expert) knowledge, dismissed Polis's stated fear of crowds: "I've gone to the Wendy's on the corner here, [it] is filled with endless people, so if you're able to wait

on line . . ." AR at 518.[9] Dr. Halperin said that he took "into consideration" the several opinions in the record that Polis could not complete a normal work week, but did not explain what effect those findings had upon his opinion. AR at 528-29. Dr. Halperin presumably disagreed with those findings, since he concluded: "[Polis] says he has a long history of anxiety attacks and depression. I really don't see it in the chart[.]" AR at 518. Dr. Halperin opined that Polis could perform "simple routine repetitive work." AR at 527.

Polis's counsel was given minimal opportunity to question Dr. Halperin; the ALJ interjected after nearly every question, and frequently diverted the discussion to irrelevant topics. *See generally* AR at 527-32.[10] Dr. Halperin also opined that Polis did not have *any* marked restrictions due to his mental condition:

> Q: Dr. Halperin, based on the evidence that I've highlighted for you, you don't believe that [Polis] has any marked restrictions in activities of daily living?
>
> A: [H]e goes out to buy food at a Burger King. He can bring out newspapers that any ordinary person does.

AR at 532.

---

[9] Polis interjected: "Actually I don't. I go to the Burger King when the window is open." AR at 518. The ALJ then said "[a]ll right, no, don't talk to [the] doctor until he is finished, please." AR at 518.

[10] For example, the ALJ focused at one point on Polis's jewelry: "[Polis] appears appropriately dressed, he's wearing jewelry around his neck." AR at 530. Polis interjected that he never took that piece of jewelry off as a matter of spiritual choice, but the ALJ said: "Okay, you have a right to do that. I'm just saying that you — you are aware of what you are wearing." *Id.*

14

**4.     *David Festa (Vocational Expert)***

David Festa ("Festa") testified by telephone as the Commissioner's vocational expert. *See* AR at 533-49.[11] He opined that, if Polis were limited to "low stress" jobs, he would not be able to do his past relevant work, but would be able to do a handful of other jobs. *See* AR at 537-40 (discussing, *inter alia*, stock checker, routing clerk, charge account clerk, etc.). The ALJ asked: "[I]f . . I accept the testimony . . . that [Polis] could not work because he has an aversion to crowds and that he could not sit or stand too long, and that if he's near a crowd he has to leave . . . could he do any of the jobs here?" Festa replied: "In my opinion such a hypothetical person would not be able to work on a full-time consistent basis, no jobs." AR at 540. The ALJ then briefly reviewed Dr. Garza's report of March 14, 2006, and asked if Polis could do any jobs based on the limitations noted by Dr. Garza; Festa replied: "My only concern there would be that such an individual because of the marked inability to complete a work week would not be able to work on a full-time basis." AR at 542. If Polis could complete a work week without limitations, however, "he could do the jobs" Festa had previously mentioned. AR at 542.

After reviewing Dr. Shamim's conclusion that Polis would face "marked" limitations in his ability to work in proximity to others, interact appropriately with the general public, and travel to unfamiliar places, Festa opined that "such an individual . . . would be off task and not be able to work on a full-time consistent basis. There would be

---

[11] The Court observes that Festa had difficulty hearing the proceedings. *See* AR at 481 ("I can barely hear you[.]"); AR at 490 ("[W]hat's happening to the phone it's fading out and all I get is silence, and then it cuts back in."); AR at 512 ("Can't hear."); AR at 527 ("I didn't hear the question[.]"); AR at 533 ("Can you put the phone closer to you because I'm having a hard time hearing you."); AR at 545 ("I didn't hear anything.").

no jobs." AR at 547. However, if Polis did not have to frequently interact with others, "the only two jobs that I could see that he could possibly do were . . . preparer and final assembler. Again, the GAF score of 50 [reported by Dr. Shamim, indicative of serious symptoms] is borderline, but I would say that he could probably do those jobs." AR at 547.

## D.    The ALJ's Decision

The ALJ denied Polis's application. AR at 13-29 (decision dated June 16, 2008). The ALJ disregarded the opinions of Polis's treating physicians for two reasons. First, and principally, they were based upon Polis's subjective complaints. *See, e.g.*, AR at 25 (assigning Dr. Shamim's opinion little weight since it was "based upon claimant's subjective statements"); AR at 26 ("mental diagnoses are made upon claimant's subjective complaints"); *see also* AR at 25 (assigning Dr. Eshkenazi's opinion no weight since it was based on Polis's subjective statements). The ALJ found that "[Polis's] subjective complaints and history are contradicted by his own activities and statements." AR at 26. In reaching this finding, the ALJ noted that: Polis's aunt cooked dinner for the two of them, AR at 19; that Polis cleaned the apartment "one time, where he had to lift 50 bags of garbage[,]" *id.*; that Polis "required no hospitalizations and has been prescribed the minimum dosage of medication [and] claimed he cannot be near crowds, [but] he had admitted he attended [a] [p]arade, without difficulty . . . He is able to walk 8-9 blocks, travel by bus at least 4-5 hours to Buffalo and travels to Riker's Island. He is a caretaker for his aunt." AR at 26-27. The ALJ also concluded that Polis had not "show[n] an effort to follow prescribed treatment . . . [Polis] has not heeded any recommended treatment for his alleged psychiatric condition." AR at 26.

The ALJ's second reason for disregarding the opinions of Polis's treating physicians was that they were inconsistent with the opinion of Dr. Halperin. AR at 25-26 (discussing Dr. Halperin's opinion).

The ALJ found that Polis suffered from depression, "recent alleged anxiety," and tendonitis of the ankles, and determined that his residual functional capacity ("RFC") limited him to "simple, repetitive, no decision making, routine jobs, known as low stress." AR at 27. Based on Festa's testimony, the ALJ concluded that Polis could not return to his past work, but that Polis's RFC would permit him to perform one of the low-stress jobs identified. *See id.* (listing "charge account clerk"; "order clerk food and beverage"; and "preparer"); *see also* AR at 21-22 (reviewing Festa's testimony). Since his RFC permitted Polis to take a different job, the ALJ concluded that Polis was not disabled within the meaning of the Social Security Act.

The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final determination. Polis timely sought judicial review.

## II

### A. Standard of Review

In reviewing the Commissioner's decision, "a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). Substantial evidence is "more than a mere scintilla," and should be that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations marks and citation omitted).

## B.    The Hearing Process

The five-step procedure used by the Commissioner for evaluating claims to DIB is well-known. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); 20 C.F.R. § 404.1520. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Second, the Commissioner considers whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities. Third, the Commissioner considers whether, based solely on medical evidence, the claimant has an impairment that meets or equals those listed by the Commissioner in the Listing of Impairments. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1. Fourth, the Commissioner determines whether, despite his severe impairments, a claimant can nonetheless perform his past work. Finally, if the claimant cannot perform his past work, the Commissioner determines whether there is other work the claimant could perform.

Polis has the burden on the first four steps; the burden shifts to the Commissioner at step five. *Balsamo*, 142 F.3d at 80. Because the ALJ concluded that Polis could not perform his past work, Polis met his burden; therefore the only disputed issue is whether the Commissioner satisfied the step five burden.

## C.    The Treating Physician Rule

Polis contends principally that the ALJ failed to adhere to the Commissioner's treating-physician rule by rejecting the opinions of Drs. Garza and Shamim. *See* Polis Br. at 16-18. "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *see also* 20 C.F.R. § 404.1527(d)(2) (assigning

"controlling weight" to "well-supported" opinions reached by "medically acceptable clinical and laboratory diagnostic techniques" that are "not inconsistent" with other substantial evidence of impairments). Where, however, a treating physician "issue[s] opinions that are not consistent with other substantial evidence, such as the opinions of other medical experts," those opinions are "not afforded controlling weight[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal citation omitted). Even when the opinions of treating physicians are rejected, the Commissioner must "always give good reasons . . . for the weight" given to those opinions. *Schaal v. Apfel*, 134 F.3d 496, 503-04 (2d Cir. 1998) (quoting 20 C.F.R. § 416.927(d)(2)).

As noted, Dr. Garza and Dr. Shamim opined that Polis, due to his mental deficits, would be limited in his ability to adhere to a normal work schedule. Festa, the vocational expert, testified that if Polis were not able to maintain a normal work schedule, there would be "no jobs" he could perform. The ALJ set aside the opinions of Drs. Garza and Shamim because they were based on Polis's subjective complaints and because they were inconsistent with Dr. Halperin's testimony.

1. ***The ALJ's Evaluation of Polis's Subjective Complaints***

Mental impairments are difficult to diagnose. "The fact that [a physician] also relied on [his patient's] subjective complaints hardly undermines his opinion as to [the patient's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (internal citation and marks omitted); *see also Clester v. Apfel*, 70 F. Supp. 2d 984 (S.D. Iowa 1999) ("Quite frankly, the Court is unaware of what a psychiatrist is expected to do . . . other than

to review the patient's history, conduct a mental status examination and to report the results and recommendations regarding the patient's ability to function." (citing 20 C.F.R. § 404.1513)).

While a claimant's daily activities might cast doubt upon the veracity of his subjective complaints where his activities are inconsistent with his complaints, the ALJ's recitation of Polis's activities was riddled with factual errors. The ALJ wrote that Polis's aunt did the cooking, but Polis testified that he did the "simple" cooking of "microwavable" food for the two. The ALJ wrote that Polis had cleaned the apartment he shared with his aunt by clearing out 50 bags of garbage, but Polis testified that Adult Protective Services had done the cleaning, testimony corroborated by the New York Supreme Court records.[12] The ALJ wrote that Polis was "a caretaker for his aunt," AR at 27, but that conclusion was not supportable: Polis had proven incapable of cleaning their shared apartment and had been declared incompetent to manage his own finances, and a guardian had also been appointed for his aunt. The ALJ wrote that Polis "visit[s] his partner at Riker's Island on a frequent basis[,]" AR at 26, but Polis testified that he had gone there once. The ALJ wrote that Polis had not heeded "any recommended treatment for his alleged psychiatric condition," AR at 26, but did not justify that finding; there was no record evidence that Polis was non-compliant with either his medications or attendance at scheduled psychiatric and psychotherapy appointments.

---

[12] The ALJ said during the hearing: "We don't know who is causing the mess there. There is [sic] two people living there. So we don't know if the landlord is upkeeping the building. It's a little too vague." AR at 532. How the testimony was vague is not apparent from the record, nor is the basis for speculating that the landlord caused the mess.

Also unsupported by the record were several of the ALJ's statements that implicitly reflected upon Polis's credibility. The ALJ repeatedly referred to Polis's anxiety disorder as an "alleged" and "recent" development, *see, e.g.,* AR at 20, 22, 26, but, as the ALJ noted elsewhere, Dr. Morse — the Commissioner's examiner — diagnosed an anxiety disorder as early as November 18, 2004. AR at 175. The ALJ therefore had little basis to refer to Polis's anxiety disorder as "alleged," much less "recent."

The ALJ also determined that Polis's attendance at a parade in 2006, and his use of public transit to attend appointments and visit his domestic partner, meant his fear of crowds was false. "[A] claimant need not be an invalid to be found disabled," however. *Balsamo,* 142 F.3d at 81 (internal quotation omitted). "When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Nelson v. Bowen,* 882 F.2d 45, 49 (2d Cir. 1989). Polis admitted to being around crowds *a single time,* and public transportation was his only available mode of transit.[13] This was hardly a sufficient basis to conclude that his stated fear of crowds was fabricated.

In sum, the ALJ's determination that Polis's subjective complaints were not credible was not supported by substantial evidence. That conclusion was the principal basis for rejecting the opinions of Drs. Garza and Shamim.

---

[13] Moreover, when Dr. Halperin suggested that Polis must be able to endure crowds because he occasionally visited fast-food restaurants, Polis promptly interjected that he only went when "the window" was open — implying that he never entered the restaurant. *See* n.9, *supra.* The ALJ's decision made no reference to this exchange.

## 2. *The ALJ's Reliance on Dr. Halperin's Opinion*

The ALJ also implicitly rejected the opinions of Drs. Garza and Shamim where they were inconsistent with that of Dr. Halperin (since the ALJ's decision relied heavily upon Dr. Halperin's view of the record evidence). Dr. Halperin's opinion, however, did not constitute substantial evidence to reject these opinions.

ALJs are entitled to call medical experts; "where the assessment of disability involves careful consideration of medical evidence, the testimony of the only medical expert must figure prominently in the ALJ's decision making." *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). In general, the opinions of treating physicians may be disregarded when inconsistent with expert opinions. *Halloran*, 362 F.3d at 32. "[N]ot all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *see also Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (noting that reports by doctors "who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for a competent evaluation[.]" (internal citation and marks omitted)).

Dr. Halperin's opinion did not constitute substantial evidence that the opinions of Polis's treating physicians were wrong. He did not examine Polis (in contrast to Drs. Garza, Shamim, Morse, and Eshkenazi). He did not issue a report. His involvement in the case was limited to his attendance and testimony at the hearing. His testimony was a rambling recitation of selected notes in Polis's chart. Despite all of the record evidence

22

of depression and anxiety noted by physicians who actually examined Polis, Dr. Halperin concluded that he "really d[idn]'t see it in the chart."

Dr. Halperin had to demonstrate why the opinions of Drs. Garza and Shamim (not to mention Drs. Morse and Eshkenazi) were wrong. His testimony failed to do so. His expert opinion therefore failed to constitute substantial evidence to reject the opinions of Polis's treating physicians. Their opinions, when combined with Festa's testimony, mandated a finding of disability.

## E.    Remand

"[W]hen, as here, the reversal is based solely on the [Commissioner's] failure to sustain his burden of adducing evidence of the claimant's capability of gainful employment . . . no purpose would be served by [] remanding the case for rehearing[.]" *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983). Especially where, as here, the Commissioner concedes that the medical records are "complete[,]" Comm'r's Br. at 24-25, and where the record provides persuasive proof of disability, a remand solely for the calculation of benefits is warranted. *See, e.g., Carroll,* 705 F.2d at 644; *Balsamo,* 142 F.3d at 82 (vacating and remanding for calculation of benefits).

### III

The Commissioner's determination is vacated. The case is remanded solely for the calculation and award of benefits.

**SO ORDERED.**

s/Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 9, 2010

23